S13A0333. SHERMAN v. ATLANTA INDEPENDENT SCHOOL SYSTEM et al.

(744 SE2d 26)

NAHMIAS, Justice.

This case involves the use of local school taxes for general redevelopment purposes following our decision in February 2008 interpreting the Georgia Constitution's Educational Purpose Clause in *Woodham v. City of Atlanta*, 283 Ga. 95 (657 SE2d 528) (2008); the subsequent amendment to the Constitution's Redevelopment Powers Clause in November 2008; and the repeal and reenactment of the statutory Redevelopment Powers Law in April 2009. Appellant John S. Sherman argues that our holding in *Woodham*, where we concluded that the proposed use of school taxes to fund bonds for the City of Atlanta's BeltLine Redevelopment Plan "violates the Educational Purpose Clause," 283 Ga. at 96, rendered the resolutions, redevelopment plans, and intergovernmental agreements ("local government approvals") approving the City's Perry-Bolton and BeltLine tax allocation districts ("TADs") unconstitutional in their entirety, void ab initio, and unamendable — even by constitutional amendment. Appellees — the Atlanta Independent School System, City of Atlanta, and Atlanta Development Authority — argue in response that *Woodham* invalidated only a particular bond issuance for the BeltLine project and had no effect at all on the constitutional validity of the local government approvals for the BeltLine TAD, much less the Perry-Bolton TAD.

Appellees are wrong. It is clear that, under the law when we decided *Woodham* in February 2008, the local government approvals for the Perry-Bolton and BeltLine TADs would have been ruled unconstitutional to the same extent that this Court held that the proposed funding for the BeltLine bonds was unconstitutional; at that time, local school taxes could not be used for general redevelopment purposes. But Sherman is also wrong — and decisively so — because the subsequent constitutional amendment and revision of the statute governing TADs *changed* the applicable law, and those changes were expressly made retroactive with respect to the county, city, and local board of education approvals needed to use school taxes for redevelopment purposes.

Thus, Sherman's constitutional challenges to the Perry-Bolton and BeltLine TADs lack merit. Sherman's other arguments, which involve the City's charter and the trial court's jurisdiction to amend an interlocutory injunction while a previous appeal in this case was pending, are also meritless. Accordingly, we affirm the trial court's grant of summary judgment to Appellees and its denial of partial summary judgment to Sherman.

1. Since its enactment, the Georgia Constitution of 1983 has contained, in Article IX, Section II, Paragraph VII (b), a Redevelopment Powers Clause authorizing cities and counties to create tax allocation districts to finance redevelopment, contingent on the General Assembly's enactment of a general law and a local law and approval of the local law in a local referendum.[1] Creating a TAD freezes the assessed value of the real property in the TAD, and for the next up to 30 years, any additional annual property taxes, or "tax allocation increments," generated as a result of rising property values are diverted to a special fund to pay redevelopment costs. This future revenue stream then can be pledged as security for the issuance of bonds to provide up-front and ongoing capital to spur investment in the TAD.

In 1985, the General Assembly implemented the Redevelopment Powers Clause by enacting the Redevelopment Powers Law, a general law authorizing cities and counties to exercise redevelopment powers. See Ga. L. 1985, p. 1360, §§ 1-3 (codified as amended at OCGA §§ 36-44-1 to 36-44-23). In 1986, the General Assembly enacted a local law amending the charter of the City of Atlanta to authorize the City to exercise redevelopment powers, see Ga. L. 1986, p. 4834, §§ 1-3; that local law was approved in a City referendum. Thus, since 1986, the City has been authorized to create TADs to fund redevelopment projects.

This case involves two of the ten TADs created by the City. In 2002, the City Council passed a resolution adopting the Northwest Atlanta Redevelopment Plan and creating the 25-year Perry-Bolton TAD in northwest Atlanta. In 2005, the City Council passed a resolution adopting the BeltLine Redevelopment Plan and creating the 25-year BeltLine TAD encircling the City's center. In each instance, the City designated the Atlanta Development Authority ("Development Authority") to serve as the redevelopment agency and authorized the issuance of bonds secured by the tax allocation increments for the TAD. The Atlanta Independent School System ("School System"), through the Atlanta Board of Education ("School Board"), consented to the inclusion of school taxes in the tax allocation increments for each TAD and executed intergovernmental agreements with the City memorializing the terms of the consent. Fulton

---

[1] See Ga. L. 1981, Ex. Sess., p. 143, § 1, at p. 212 (proposing the Georgia Constitution of 1983, including the Redevelopment Powers Clause, for ratification at the 1982 general election); Ga. L. 1984, p. 1709, §§ 1-2 (proposing an amendment, which was ratified, revising the Redevelopment Powers Clause to require approval of the local law in a referendum "by a majority of the qualified voters voting thereon in the county or municipality," instead of a majority of all of the qualified voters of the county or municipality).

County (the "County") also consented to the inclusion of county property taxes in the tax allocation increments for these two TADs.

In 2006, in accordance with the Revenue Bond Law, OCGA §§ 36-82-60 to 36-82-85, the Fulton County District Attorney filed a petition in the Fulton County Superior Court against the City, the County, and the School System to confirm and validate the issuance of bonds secured by the BeltLine TAD tax allocation increments in an amount not to exceed $200 million. In 2007, the trial court entered an order confirming and validating the bond issuance, but on appeal, this Court reversed. See *Woodham v. City of Atlanta*, 283 Ga. 95, 96-98 (657 SE2d 528) (2008). We held that the inclusion of school taxes in the BeltLine TAD tax allocation increments violated the Constitution's Educational Purpose Clause, which restricts the use of local school tax funds to the support and maintenance of public schools, public education, and "activities necessary or incidental thereto." Ga. Const. of 1983, Art. VIII, Sec. VI, Par. I (b). We explained that

> school taxes cannot be used to fund the BeltLine Plan which provides a benefit to all citizens, and which has little, if any, nexus to the actual operation of public schools in the city of Atlanta. Although appellees assert that the BeltLine TAD will likely produce future revenue for the school system, such potential benefit "will not suffice where the constitutional authorization for such expenditure is lacking."

*Woodham*, 283 Ga. at 97 (citation omitted).

Just three months later, on May 14, 2008, the General Assembly proposed a constitutional amendment to allow school taxes to be used for general redevelopment purposes and projects. See Ga. L. 2008, p. 1211, §§ 1-2. The amendment was ratified at the November 2008 general election and took effect on January 1, 2009.[2] The 2008 Amendment revised the Redevelopment Powers Clause to authorize the enactment of a new general law after January 1, 2009, allowing such use of school tax funds "notwithstanding [the Educational Purpose Clause] or any other provision of this Constitution."[3] The 2008 Amendment imposed an additional constitutional requirement

---

[2] See Ga. Const. of 1983, Art. X, Sec. I, Par. VI ("Unless the amendment . . . itself or the resolution proposing the amendment . . . shall provide otherwise, an amendment to this Constitution . . . shall become effective on the first day of January following its ratification.").

[3] School tax funds pledged to repay TAD bonds that had already been judicially validated did not require authorization by a new general law. See generally Ga. Const. of 1983, Art. IX, Sec. VI, Par. IV ("The General Assembly shall provide for the validation of any revenue bonds authorized and shall provide that such validation shall thereafter be incontestable and conclusive."); OCGA § 36-82-78.

for the creation of TADs — "approval by resolution of the applicable governing body of the county, municipality, or local board of education." But the amendment also authorized the General Assembly to give effect to such approvals in the new general law "regardless of whether any county, municipality, or local board of education approved the use of such tax funds for such [redevelopment] purposes and programs before January 1, 2009" — that is, without regard to whether the approval occurred before or after the amendment took effect.[4]

On December 17, 2008, John C. Clark filed this case in the Fulton County Superior Court against the School System, the Development Authority, and six "John Doe" defendants, alleging that school taxes had been illegally diverted to the Development Authority to fund the City's TADs. The complaint sought class certification, interlocutory and permanent injunctions barring the School System from disbursing school taxes previously levied in conjunction with the TADs, and either a refund to the class members of all such school taxes or an order directing the School System to spend those funds for educational purposes and to credit such expenditures against "the next ensuing levy" of school taxes against the class members. In March 2009, the City was substituted for defendant John Doe 1.

On April 3, 2009, the General Assembly repealed and reenacted the Redevelopment Powers Law as authorized by the 2008 Amendment. See Ga. L. 2009, p. 158, §§ 1-2. Among other things, the new general law said:

> Any consent by a local board of education to the inclusion of educational ad valorem property taxes as a basis for computing tax allocation increments and any authorization to use such funds for such purposes that was approved before January 1, 2009, and not rescinded or repealed prior to the effective date of this Code section is ratified and confirmed....

Ga. L. 2009, p. 158, § 2, at p. 172 (codified as amended at OCGA § 36-44-9 (g)).

On April 8, 2009, the trial court issued an interlocutory injunction (the "2009 Interlocutory Injunction") prohibiting the School System and the Development Authority from disbursing or spending any school taxes previously levied in connection with the Perry-Bolton and BeltLine TADs. On April 13, the School Board passed a

---

[4] The complete text of the amended Redevelopment Powers Clause is shown in an appendix to this opinion.

resolution changing the effective date of its consent to participate in the Perry-Bolton and BeltLine TADs to the effective date of the new Redevelopment Powers Law, which was April 22, the day that the Governor signed the law. On June 8 and July 6, the School Board passed resolutions authorizing amendments to the intergovernmental agreements for the Perry-Bolton and BeltLine TADs stating that "all agreements between the parties and all revisions" to the agreements were "subject to the outcome of pending litigation regarding the use of . . . school tax increment[s] for [TADs]." The amendments acknowledged that school taxes levied after April 22 would be included in the tax allocation increments for the Perry-Bolton and BeltLine TADs but required the immediate release to the School System of the "Retroactive Increment" — meaning all school taxes included in the tax allocation increments for these TADs levied prior to April 22 — "contingent upon constraints imposed by pending court order(s), if any," in this case. (Recall that the trial court's 2009 Interlocutory Injunction barred disbursement of school taxes levied in connection with these TADs.) The City agreed to the amendments, and the revised intergovernmental agreements were duly executed.

On July 28, 2009, Appellees filed a motion for summary judgment. On October 2, Clark amended the complaint to allege that the April 13 and June 8 School Board resolutions (but not the July 6 resolution) were unconstitutional to the extent that they contemplated the use of school taxes for non-educational purposes. On October 27, Clark filed a motion for a temporary restraining order to enjoin the disbursement of school taxes connected with the Perry-Bolton and BeltLine TADs, and on December 14, he filed a motion for partial summary judgment. On January 13, 2010, Appellees filed a cross-motion for summary judgment, and on January 29, the trial court allowed John S. Sherman to be added as a named plaintiff.

On August 3, 2010, the trial court treated Clark's motion for a temporary restraining order as a motion for an interlocutory injunction and denied it. The court further ordered that its 2009 Interlocutory Injunction "be amended to allow the City and the [Development Authority] to return" the Retroactive Increment to the School System, as the revised intergovernmental agreements provided. The order further stated, "The parties may present an order to the Court which effectuates the [School Board] resolutions adopted on April 13, 2009 and June 8, 2009."

On August 5, 2010, Sherman and Clark filed a notice of appeal, and they paid the court costs for the appeal the next day. Two weeks later, on August 19, the trial court amended the 2009 Interlocutory Injunction to "expressly authorize[ ] [the] transfer to [the School System of] any and all educational ad valorem tax increment[s] from

the BeltLine and/or Perry-Bolton [TADs] for all tax years through and including tax year 2009." Sherman and Clark also appealed that order, and Appellees cross-appealed. The Court of Appeals dismissed both appeals and the cross-appeal for lack of jurisdiction and later denied a motion for reconsideration. See *Clark v. Atlanta Independent School System*, 311 Ga. App. 255 (715 SE2d 668) (2011).[5]

On September 23, 2011, Sherman and Clark withdrew their request for class certification and filed "Plaintiffs' Amended, Restated and Consolidated Complaint," eliminating many of their earlier allegations and requests for relief. On October 20, the trial court held a summary judgment hearing, and on November 15, the court granted summary judgment to Appellees on all claims and denied Sherman and Clark's motion for partial summary judgment. Sherman and Clark filed a timely appeal to the Court of Appeals, but Clark later withdrew from the appeal, leaving Sherman as the sole appellant.

On October 23, 2012, the Court of Appeals transferred the case to this Court based on our constitutional question jurisdiction. See Ga. Const. of 1983, Art. VI, Sec. VI, Par. II (1). On December 10, we denied Sherman's motion to return this case to the Court of Appeals and also denied his motion to consolidate this appeal with his appeal of an order by a different trial judge in a separate case confirming and validating the issuance of bonds secured by the Perry-Bolton TAD tax allocation increments. See *Sherman v. City of Atlanta*, 293 Ga. 169 (744 SE2d 689) (2013).[6] This case was orally argued on February 4, 2013.[7]

---

[5] Consistent with the trial court's amended injunction, the school taxes related to Perry-Bolton and BeltLine TAD funding before the 2008 Amendment and the 2009 Redevelopment Powers Law took effect have apparently been returned to the School System. See *Clark*, 311 Ga. App. at 257. Thus, this case now affects only school taxes levied after April 2009.

[6] Among other things, *Sherman v. City of Atlanta* involves a question of Sherman's standing to intervene in the bond validation proceeding and to bring that appeal. There is no such issue in this case. The trial court here denied a motion to dismiss on the ground that Clark and Sherman lacked standing, specifically finding, after a hearing, that "Plaintiffs have standing to bring the within action." The record does not contain a transcript of that hearing, and we must therefore assume that the court's finding had a proper foundation. See *Foster v. Weitzel*, 291 Ga. 305, 306 (728 SE2d 684) (2012) ("In the absence of a transcript, 'we must assume that the evidence presented was sufficient to support the [trial] court's findings.'" (citation omitted)). Appellees do not contend otherwise.

[7] Sherman's initial brief in this appeal was 38 pages long, violating this Court's Rule 20, which says that "[b]riefs . . . shall be limited to 30 pages in civil cases, except upon written request directed by letter to the Clerk and authorized by the Court prior to the due date of the filing." After Appellees filed a responsive brief of appropriate length, Sherman filed a 15-page reply brief. On February 1, the Friday before the Monday oral argument in this case, Sherman filed a 27-page "Supplemental Reply Brief." At the oral argument, Appellees requested permission to file a brief responding to Sherman's 11th-hour filing, which the Court granted, and on February 14, Appellees filed a 14-page post-argument brief. Two-and-a-half months later, on April 30, Sherman filed a 30-page "Post-Argument Supplemental Brief." Sherman's

2. Sherman argues that the trial court erred in denying his claim that *Woodham* declared unconstitutional the local government resolutions and associated redevelopment plans and intergovernmental agreements approving the Perry-Bolton and BeltLine TADs because they violated the Educational Purpose Clause. Sherman also argues that the trial court erred in giving the 2008 Amendment retroactive effect, thereby mooting our decision in *Woodham*, and in failing to recognize that the School Board's 2009 consent to participate in the two TADs and the 2009 amendments to the intergovernmental agreements for the two TADs are inchoate and inoperative.

(a) In response to these arguments, Appellees assert that *Woodham* had no effect whatsoever on the validity of the local government approvals for the BeltLine TAD, much less those for the Perry-Bolton TAD. That assertion is untenable.

In *Woodham*, we reversed the trial court's order validating a bond issuance for the BeltLine TAD because a component of the payment and security for the bonds — the school taxes included in the tax allocation increments — was unconstitutional. We explained that school taxes could not "constitutionally be applied to benefit the BeltLine project" or "used to fund the BeltLine Plan" because the redevelopment project was not " 'necessary or incidental' to public schools or public education" as required by the Educational Purpose Clause. *Woodham*, 283 Ga. at 97.

It is true that our decision in *Woodham* did not address or cast doubt on any *non-school-tax* sources of funding for the BeltLine or other TADs. But to the extent that the BeltLine's local government approvals called for general funding of that project with school taxes, they were equally unconstitutional after *Woodham*. Likewise, local government approvals for the Perry-Bolton and all other TADs also were unconstitutional after *Woodham* to the extent that they allowed the funding of general redevelopment projects not " 'necessary or incidental' to public schools or public education" using school taxes (with the exception of any bonds that had already been validated, see Ga. Const. of 1983, Art. IX, Sec. VI, Par. IV; OCGA § 36-82-78). That is the effect of a precedential decision of this Court. See Ga. Const. of 1983, Art. VI, Sec. VI, Par. VI. Accordingly, the reliance on school

---

briefing prior to oral argument already substantially exceeded the 30-page limit in civil cases, and he did not receive the Court's permission to file a post-oral argument brief. While our rules allow supplemental briefs to be filed "at any time before decision," such briefs that "serve only to circumvent the limitation on pages for civil cases . . . will not be considered." Supreme Court Rule 24. Accordingly, we have not considered Sherman's Post-Argument Supplemental Brief, and we remind Sherman and his counsel of the need to abide by the rules of this Court. See Supreme Court Rule 7.

taxes to help fund the Perry-Bolton and BeltLine TADs is constitutional, if at all, only because of the changes to the Georgia Constitution after *Woodham*. We now turn to that question.

(b) Sherman maintains that the 2008 Amendment to the Constitution changed nothing relevant to this case, so that *Woodham* still controls and the BeltLine and Perry-Bolton TADs are entirely unconstitutional. In its broad formulation, Sherman's position is obviously wrong. As noted previously, *Woodham* did not affect the constitutionality of these two redevelopment projects to the extent that they rely on funding from sources other than school taxes; it was only the use of school tax funds for general redevelopment projects that was addressed and declared unconstitutional in *Woodham*. Nevertheless, the original and amended local government approvals for the BeltLine and Perry-Bolton TADs authorize the use of school tax funds and thus would be unconstitutional if still controlled by *Woodham*.

On this critical point, however, Sherman's argument reflects

> a failure to keep in mind the difference between the power of the legislature to pass laws, subject to the constitution of the State and the limitations imposed thereby, and the power of the legislature to propose and of the people to ratify, in the prescribed method, an amendment to the constitution.

*Hammond v. Clark*, 136 Ga. 313, 328 (71 SE 479) (1911). The Georgia Constitution "is the supreme State law," id. at 319,[8] and our Constitution can be amended to make constitutional things that were once declared by this Court to be unconstitutional, see id. at 334. This process was explained a century ago in *Hammond*:

> On account of provisions in the constitution of the State, this court held that the legislature could not supplement salaries of the judges of the superior court from county treasuries. Thereupon, not seeking to reverse such adjudication, but recognizing it, the legislature proposed and the people ratified an amendment to the constitution by which that was rendered constitutional which previously the legislature could not constitutionally do.

Id. (citation omitted). The same process has been followed in this State on numerous occasions; it is indeed an essential aspect of our

---

[8] A provision of the Georgia Constitution may be rendered invalid under federal law through the operation of the Supremacy Clause in Article VI of the United States Constitution, but Sherman does not enumerate any such issue in this appeal.

republican form of government, in which the people, not the judges, have ultimate control over the law under which they live.[9]

The 2008 Amendment was another iteration of this process. It authorized the General Assembly to enact a general law permitting

> the use of . . . school tax funds . . . to fund . . . redevelopment purposes and programs, including the payment of debt service on tax allocation bonds, *notwithstanding Section VI of Article VIII* [the Educational Purpose Clause] *or any other provision of this Constitution.*

Ga. Const. of 1983, Art. IX, Sec. II, Par. VII (b) (emphasis added). This new constitutional provision plainly makes constitutional precisely what was declared to be unconstitutional in *Woodham*, and our holding in that case therefore has no ongoing effect.

(c) Sherman argues vociferously, however, that an unconstitutional law is "void from inception" and thus such a law cannot merely be amended to make it constitutional. Because *Woodham* rendered the original TADs unconstitutional, the argument goes, the Perry-Bolton and BeltLine local government approvals could not be amended after the 2008 Amendment and those approvals cannot provide the approvals that are required to use school tax funds to support those TADs.

As Sherman says, this Court has on several occasions invoked the following broad statement from the United States Supreme Court's decision in *Norton v. Shelby County*, 118 U. S. 425, 442 (6 SCt 1121, 30 LE 178) (1886): "An unconstitutional act is not a law; it confers no rights; it imposes no duties; it affords no protection; it creates no office; it is, in legal contemplation, as inoperative as though it had never been passed." See, e.g., *Stewart v. Davidson*, 218 Ga. 760, 764 (130 SE2d 822) (1963). And we have said in *Jones v. McCaskill*, 112 Ga. 453 (37 SE 724) (1900), and other cases that "[t]he time with reference to which the constitutionality of an act of the General Assembly is to be determined is the date of its passage, and if it is unconstitutional then, it is forever void." Id. at 456.

But such statements reflect a general legal principle, not an existential one. As we explained in *Henson v. Georgia Industrial Realty Co.*, 220 Ga. 857 (142 SE2d 219) (1965), none of those cases

---

[9] The same process occurs in federal law, although less frequently due to the greater difficulty in amending the federal Constitution. See, e.g., U. S. Const. Amend. XVI (allowing Congress to impose income taxes without apportionment among the states, which had been held unconstitutional in the *Income Tax Cases*, 157 U. S. 429 (15 SCt 673, 39 LE 759) (1895), and 158 U. S. 601 (15 SCt 912, 39 LE 1108) (1895)).

"deal[t] with an Act which an amendment to our Constitution specifically authorized and validated." Id. at 862. Put another way, while the Constitution generally prohibits retroactive legislation, see Ga. Const. of 1983, Art. I, Sec. I, Par. X ("No . . . retroactive law . . . shall be passed."), a constitutional amendment can expressly authorize an exception to that general rule.

> [T]he constitution itself may be amended in the manner provided by it; and when an amendment has been duly made, it becomes as much a part of the constitution as any other part thereof. It can hardly be asserted that one part of the constitution is unconstitutional because it is not in perfect accord with another part of the same instrument.

*Hammond*, 136 Ga. at 328.

The 2008 Amendment to the Redevelopment Powers Clause expressly authorized the General Assembly to give effect to local approvals of the use of school taxes for TADs *without regard* to whether those approvals occurred before the effective date of the constitutional amendment, that is, "regardless of whether any county, municipality, or local board of education approved the use of such tax funds for such purposes and programs before January 1, 2009." Ga. Const. of 1983, Art. IX, Sec. II, Par. VII (b). The General Assembly exercised this constitutionally granted authority in revising the Redevelopment Powers Law to state:

> Any consent by a local board of education to the inclusion of educational ad valorem property taxes as a basis for computing tax allocation increments and any authorization to use such funds for such purposes that was approved before January 1, 2009, and not rescinded or repealed prior to the effective date of this Code section is ratified and confirmed . . . .

See Ga. L. 2009, p. 158, § 2, at p. 172 (codified as amended at OCGA § 36-44-9 (g)). Thus did the amended Constitution and the new statute it authorizes resurrect the TAD approvals that *Woodham* had rendered lifeless.

(d) In sum, the 2008 Amendment to the Constitution's Redevelopment Powers Clause, as implemented by the 2009 revision of the Redevelopment Powers Law, both "established the rule for the future, and ratified what had been done in the past." *Hammond*, 136 Ga. at 337. See also *Henson*, 220 Ga. at 862 ("[T]he rulings of this court in *Jones v. McCaskill* [and similar cases] do not . . . require a different holding in this case since none of those cases deals with an Act which

an amendment to our Constitution specifically authorized and validated."). Accordingly, despite our decision in *Woodham* and the general rule against retroactive legislation, the original, pre-2008 Amendment resolutions of the Atlanta School Board and the other local government acts approving the use of school taxes in the tax allocation increments for the BeltLine and Perry-Bolton tax allocation districts are not unconstitutional and remain effective, subject to any subsequent amendments thereto.

3. Sherman's other challenges to the TADs also lack merit.

(a) Sherman contends that § 6-101 (e) of the City of Atlanta's Charter, see generally Ga. L. 1996, p. 4469, which authorizes the City to assess, levy, and collect "an annual ad valorem tax for the support of public schools and for educational purposes," is essentially a mini-Educational Purpose Clause prohibiting the City from using school property taxes for general redevelopment purposes. Sherman adds that unlike the Constitution and the Redevelopment Powers Law, this charter provision has not been amended since *Woodham*.

However, as Appellees correctly respond, the City's authority to assess, levy, and collect taxes for the Atlanta Independent School System is based not on its local charter but on a general law, OCGA § 48-5-405 (a), which is expressly "cumulative of . . . local laws authorizing municipalities to levy taxes for the support of independent school systems permitted to be maintained by law." OCGA § 48-5-405 (b). Moreover, Charter § 1-102 (c) grants the City "all powers now vested in the city *and now or hereafter granted to municipal corporations by the laws of Georgia*" (emphasis added), making it clear that § 6-101 (e) does not impose any restrictions on the City's taxing power that do not apply to municipalities generally.[10]

(b) Sherman also argues that City Charter § 3-104 (10), which authorizes the Mayor to execute "instruments and documents on

---

[10] Although Sherman does not mention it, we note that OCGA § 48-5-405 (a) also limits the use of school taxes to "educational purposes." However, the 2009 Redevelopment Powers Law says:

> If the board of education of the independent school system is empowered to set the ad valorem tax millage rate for educational purposes and the local legislative body of the municipality does not have the authority to modify such rate set by the board of education, the tax allocation increment shall not be computed on the basis of municipal taxes for educational purposes *unless* the board of education of the independent school system consents, by resolution duly adopted by said board of education, to the inclusion of educational ad valorem property taxes as a basis for computing tax allocation increments.

OCGA § 36-44-9 (a) (emphasis added). Because the Atlanta School Board has so consented, the statutes read together (and in conjunction with the amended Redevelopment Powers Clause) allow the use of school property taxes for the BeltLine and Perry-Bolton TADs. See Division 2 above.

behalf of the city . . . after final approval by the council," required the trial court to invalidate the 2004 intergovernmental agreement ("IGA") for the Perry-Bolton TAD, because the trial court found that the 2004 IGA was not expressly approved in final form by the Atlanta City Council before the Mayor signed it. Sherman relies on *H.G. Brown Family Limited Partnership v. City of Villa Rica*, 278 Ga. 819 (607 SE2d 883) (2005), where this Court said: "Where a city charter specifically provides how a municipal contract shall be made and executed, the city may only make a contract in the method prescribed." Id. at 820. But see id. (explaining that " '[i]f the contract was imperfectly or irregularly executed, it may not necessarily be completely ineffective, as long as it was the type of contract within the power of the local government to make' " (citation omitted)).

We need not decide the merits of this argument. Pretermitting whether the 2004 intergovernmental agreement was the sort of instrument or document the Council had to approve before the Mayor could execute it on behalf of the City, and also pretermitting whether the Council's authorization to the Mayor to execute an amendment to the 2004 Perry-Bolton IGA in 2009 *implicitly* ratified the Mayor's execution of the original agreement,[11] on October 3, 2011, the City Council passed a resolution *expressly* ratifying the Mayor's 2004 execution of the Perry-Bolton IGA. See *Whitley v. James*, 121 Ga. 521, 523 (49 SE 600) (1904) (holding that "ratification, whether soon or late, was the equivalent of an original command, and cured any defect in the execution of the power" by the agent). The City Council's express ratification of the Mayor's action cured any defect in it, and Sherman's claim under Charter § 3-104 (10) therefore fails. Compare *City of Baldwin v. Woodard & Curran, Inc.*, 293 Ga. 19 (743 SE2d 381) (2013) (holding that a city contract was ultra vires and void where the mayor signed it but the city council *never* approved it as required by the city charter for the contract to be binding).

4. Finally, Sherman argues that the trial court's August 19, 2010 order, which amended the court's 2009 Interlocutory Injunction to expressly allow the transfer to the School System of all school taxes from the Perry-Bolton and BeltLine TADs up to and including the 2009 tax year, was void because the court lacked jurisdiction to enter

---

[11] See OCGA § 10-6-51 (stating that a principal may ratify an agent's acts in full even if the acts exceeded the scope of the agent's authority); *Lippincott & Co. v. Behre*, 122 Ga. 543, 547 (50 SE 467) (1905) (finding ratification where the principal approved amendments to a contract that was originally made by an agent). Compare *City of Atlanta v. Smith*, 84 Ga. App. 815, 815 (67 SE2d 480) (1951) (finding no ratification of a municipal contract where the plaintiff did not allege that the contract was made by persons who purported to act as agents of the city and that the contract was ratified by the city with knowledge of all its terms).

that order due to the appeal Sherman had filed in the case on August 5, which he asserts acted as a stay of the trial court proceedings. Sherman relies in part on a statement the Court of Appeals made at the end of its opinion denying his motion for reconsideration after that court had dismissed his (and then co-plaintiff Clark's) previous appeal of the August 19 order, which Sherman says established the law of the case. See *Clark v. Atlanta Independent School System*, 311 Ga. App. 255, 260 (715 SE2d 668) (2011); OCGA § 9-11-60 (h) (setting forth the law of the case rule for rulings by the Supreme Court and the Court of Appeals).

However, to the extent that Sherman now seeks to challenge the August 19 order, the Court of Appeals ruled *against* Sherman in *Clark*, dismissing his direct appeal of that order and denying his motion for reconsideration, see 311 Ga. App. at 259, 260; he does not get a second chance to appeal the same order. See *Houston County v. Harrell*, 287 Ga. 162, 163 (695 SE2d 29) (2010) ("[A] party is not entitled to a second appeal from a single order."). "[Sherman]'s first direct appeal 'was dismissed, and with the usual consequence that the ruling[ ] of the lower court, by operation of law, stood as if affirmed.'" Id. at 164 (citation omitted). And to the extent that Sherman is arguing that the August 19 order was not just a ruling on an interlocutory injunction but instead was a partial summary judgment on the merits of his claims, which somehow should have affected the trial court's subsequent summary judgment order at issue in this appeal, he forfeited that argument by failing to raise it in the trial court. See *Pfeiffer v. Georgia Dept. of Transp.*, 275 Ga. 827, 829 (573 SE2d 389) (2002).

Moreover, it is clear that the August 19, 2010 order (like the court's August 3, 2010 order) was "an amendment of the [trial] court's order of April 8[, 2009] granting an interlocutory injunction," *Clark*, 311 Ga. App. at 258, and was not a grant of partial summary judgment. See id. at 259 (concluding that the "parties' cross-motions for partial summary judgment . . . remain pending in the trial court"), id. at 260 (rejecting Sherman's motion for reconsideration after concluding that his "implication that the Aug. 19 order is an implied summary judgment is an implication or inference too subtle for appellate correction"). And an appeal of an order regarding an interlocutory injunction does *not* automatically stay the trial court proceedings. See id. at 257; OCGA § 9-11-62 (a) ("Unless otherwise ordered by the court, an interlocutory or final judgment in an action for an injunction . . . shall not be stayed . . . during the pendency of an appeal. . . ."); *Knapp v. Cross*, 279 Ga. App. 632, 634 (632 SE2d 157) (2006) (explaining that OCGA § 9-11-62 (a) creates an exception to the automatic supersedeas of OCGA § 5-6-46 (a)).

Thus, this enumeration of error is also meritless.[12]
*Judgment affirmed. All the Justices concur.*

APPENDIX.

The Redevelopment Powers Clause of Article IX, Section II of the Georgia Constitution of 1983 provides in full as follows, with the changes made by the 2008 Amendment in italics:

*(a.1) The General Assembly may authorize any county, municipality, or housing authority to undertake and carry out community redevelopment.*

(b) The General Assembly is *also* authorized to grant to counties or municipalities for redevelopment purposes and in connection with redevelopment programs, as such purposes and programs are defined by general law, the power to issue tax allocation bonds, as defined by such law, and the power to incur other obligations, without either such bonds or obligations constituting debt within the meaning of Section V of this article, and the power to enter into contracts for any period not exceeding 30 years with private persons, firms, corporations, and business entities. *Such general law may authorize the use of county, municipal, and school tax funds, or any combination thereof, to fund such redevelopment purposes and programs, including the payment of debt service on tax allocation bonds, notwithstanding Section VI of Article VIII or any other provision of this Constitution and regardless of whether any county, municipality, or local board of education approved the use of such tax funds for*

---

[12] The Court of Appeals did say, at the very end of its discussion denying Sherman's motion for reconsideration, "[w]e do not accept the alleged partial summary judgment as an independent basis for appellate jurisdiction and the Aug. 19 order was void anyway, because the filing of the notice of appeal from the Aug. 3 order was an automatic supersedeas." *Clark*, 311 Ga. App. at 260. When read in the full context of the Court of Appeals' opinion, however, it becomes clear that the court was saying that even if it had accepted Sherman's claim that the August 3 order was a partial summary judgment, he could not obtain relief on his appeal of the August 19 order, because the appeal of the August 3 order would *under that counter-factual assumption* – i.e., "anyway" – have acted as a supersedeas rendering the August 19 order void (and Sherman could no longer challenge the August 3 order because the remittitur on the appeal of that order had already been filed, see id. at 259). All of this convoluted analysis was necessary because Sherman had tried to disclaim that the August 3 and August 19 orders involved injunctions (which normally would have made those orders directly appealable), a strategy Sherman had to try because he had failed to obtain a supersedeas to prevent the school tax funds from being transferred as allowed by the amended 2009 Interlocutory Injunction, thereby rendering any appeal of the injunctive relief at issue in those orders moot. See id. at 257.

*such purposes and programs before January 1, 2009. No county, municipal, or school tax funds may be used for such purposes and programs without the approval by resolution of the applicable governing body of the county, municipality, or local board of education. No school tax funds may be used for such purposes and programs except as authorized by general law after January 1, 2009; provided, however, that any school tax funds pledged for the repayment of tax allocation bonds which have been judicially validated pursuant to general law shall continue to be used for such purposes and programs.* Notwithstanding the grant of these powers pursuant to general law, no county or municipality may exercise these powers unless so authorized by local law and unless such powers are exercised in conformity with those terms and conditions for such exercise as established by that local law. The provisions of any such local law shall conform to those requirements established by general law regarding such powers. No such local law, or any amendment thereto, shall become effective unless approved in a referendum by a majority of the qualified voters voting thereon in the county or municipality directly affected by that local law.

DECIDED JUNE 3, 2013 —
RECONSIDERATION DENIED JULY 1, 2013.

*Hurt, Stolz & Cromwell, Irwin W. Stolz, Jr., Robert D. Feagin, John F. Woodham*, for appellant.

*Holland & Knight, Sarah L. Zampell, Joshua I. Bosin, Charles S. Johnson III, Paul E. Vranicar, Brinson, Askew, Berry, Seigler, Richardson & Davis, Norman S. Fletcher, Lee B. Carter, Jeffrey S. Haymore, Cathy Hampton, Lemuel H. Ward, Matthew C. Welch*, for appellees.

